This decision was not selected for publication in the New Mexico Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Please also note that this electronic decision may contain computer-generated errors or other deviations from the official paper version filed by the Supreme Court and does not include the filing date.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

Opinion Number:

Filing Date:

**NO. 30,607**

**STATE OF NEW MEXICO,**

      Plaintiff-Appellee,

v.

**PEDRO ZARAZUA,**

      Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF EDDY COUNTY**
**Thomas A. Rutledge, District Judge**

Liane E. Kerr, L.L.C
Liane E. Kerr
Albuquerque, NM

for Appellant

Gary K. King, Attorney General
Andrea Sassa, Assistant Attorney General
Santa Fe, NM

for Appellee

## DECISION

**MAES, Justice.**

{1}     Defendant, Pedro Zarazua, was convicted of first-degree murder, contrary to NMSA 1978, Section 30-2-1 (1963, as amended through 1994), for the death of James Thomas "Birdman" Sparrow (Victim).  Pursuant to Rule 12-102(A)(1) NMRA, Defendant appeals his conviction directly to this Court, arguing that (1) the evidence was insufficient to support a conviction of first-degree murder; (2) the district court improperly admitted into evidence a graphic, forensic picture of Victim at the crime scene; and (3) the district court improperly qualified Lieutenant Jeff Zuniga to testify as an expert witness concerning blood spatter evidence.  We conclude that the evidence was sufficient to support Defendant's conviction, the district court properly admitted the graphic photograph and properly qualified the State's witness as an expert.  We affirm the conviction.

**I.     FACTS AND PROCEDURAL HISTORY**

{2}     The jury could have found the following facts.  On December 24, 2005, Defendant and his associates "pulled over" the vehicle in which Victim was traveling to confront Victim about a $50.00 debt, because he believed that Victim had sold him fake drugs.  A passenger from Victim's vehicle, George Luevano, intervened, and though some words were exchanged, no physical altercation ensued from the confrontation.

**{3}** Four days later, Victim was at the apartment of Lydia Lujan. Several witnesses testified that Defendant was there as well and that he appeared to be "pumped up." Defendant was observed carrying a handgun with a brown handle in his right pocket. Around this time, Lindsey Sparrow, Victim's sister, received a call from Victim asking her to lend him $50.00 to pay a debt involving drugs and informing her that it was a "life or death situation." Victim told her that he feared Defendant would stab him if he did not pay up. Sparrow was unable to provide her brother with the funds he requested.

**{4}** Lujan testified that Defendant persuaded Victim to leave the apartment with him and that Defendant later returned in the company of two unidentified females, but without Victim. Other witnesses testified that they saw Victim in the parking lot of Lujan's apartment complex with another male and that the two left together in a gray car. One of these witnesses also testified that the same unknown male later returned without Victim, accompanied by two women. Lujan testified that Defendant admitted to killing Victim and went into her house to wash blood off of his hands.

**{5}** On the night of the murder, two residents of the North Park Trailer Park testified that they heard four gunshots shortly after midnight. One stated that she was inside her home, but after hearing the shots she went outside to see what had happened and observed a gray car speeding away. She called the police, and the

first officer arrived on the scene within a few minutes. The reporting witness pointed the officer to the direction from which she believed the shots had originated, and upon inspection, the officer found Victim on the ground with what appeared to be gunshot wounds to the head.

{6} Lead crime scene investigator, Lt. Jeff Zuniga, arrived on the scene at approximately 2:45 a.m. Lt. Zuniga took several photographs as he processed the scene, including one close-up of Victim's wounds to the head. He also observed blood spatter patterns surrounding Victim and blood pooling around Victim's head. A subsequent autopsy revealed that Victim had been shot four times, resulting in three wounds "to the right side of the head and one to the right side of the back." The Office of the Medical Investigator's forensic pathologist testified that any one of the four wounds could have caused Victim's death.

{7} Before dawn on the day after the murder, Defendant met with Robert Hernandez in order to obtain ammunition for a .357 handgun. Hernandez testified that Defendant needed bullets for his .357 handgun because he had run into trouble with the police and that Luevano might be after him as well. Being without such caliber ammunition, Hernandez offered to lend Defendant his .45 handgun for the night in exchange for the .357 handgun. Hernandez kept the .357 handgun until he was arrested on non-related charges on December 30, 2005. Once in custody, Hernandez informed the authorities that he was in possession of a .357 handgun

4

that he believed was used to murder Victim and that he could arrange to have it delivered to an officer. Hernandez telephoned his girlfriend and had her retrieve the gun and give it to an officer. Bullet comparison and ballistic analysis later established that the .357 handgun was the weapon used to kill Victim.

{8}     A jury found Defendant guilty of murder in the first degree and was given a life sentence. This direct appeal followed. *See* N.M. Const. art. VI, § 2 ("Appeals from a judgment of the district court imposing a sentence of death or life imprisonment shall be taken directly to the supreme court."); *accord* Rule 12-102(A)(1) NMRA.

## II.     DISCUSSION

### A.     Whether the evidence was sufficient to support Defendant's conviction of murder in the first degree.

{9}     Defendant claims that the evidence relied upon by the jury was insufficient to support a conviction of murder in the first degree. Although the substance of Defendant's challenge is somewhat unclear, Defendant seems to argue that circumstantial evidence alone is insufficient to support a jury's finding of guilt on the element of deliberate intent. Defendant asserts that "the State must present both direct evidence of a specific intent to kill and evidence of an overt act from which the jury may infer such an intent." Defendant concludes the argument on this point, stating, "Defendant admits that if the jury were to buy the tenuous theory set forth by the State, the jury could circumstantially find that he planned to

5

kill [Victim]; however, inasmuch as there was no forensic evidence linking the Defendant to the murder, deference to the jury's finding cannot stand." Defendant's claim is without merit.

**{10}** In reviewing a conviction for sufficient evidence, we "examine the record to determine whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Day*, 2008-NMSC-007, ¶ 15, 143 N.M. 359, 176 P.3d 1091 (internal quotation marks and citation omitted). "We view the evidence in the light most favorable to the verdict, resolving all conflicts therein and indulging all permissible inferences therefrom in favor of the verdict." *Id.* (internal quotation marks and citation omitted). Viewing the evidence in the light most favorable to the verdict, if the Court determines that the jury could not reasonably infer guilt with respect to an element of the crime, then such an inference is speculative and there is insufficient evidence to support the conviction. *See State v. Apodaca,* 118 N.M. 762, 765-66, 887 P.2d 756, 759-60 (1994); *State v. McGee*, 2002-NMCA-090, ¶ 20, 132 N.M. 537, 51 P.3d 1191; *State v. Hernandez*, 1998-NMCA-082, ¶ 6, 125 N.M. 661, 964 P.2d 825. However, "[c]ontrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject Defendant's version of the facts." *State v. Duran*, 2006-NMSC-035, ¶ 5, 140 N.M. 94, 140 P.3d 515 (internal quotation marks and

citation omitted).

{11}    This Court has consistently held that when "reviewing the sufficiency of the evidence to establish that the defendant acted with deliberate intent, we inquire whether substantial evidence, *either direct or circumstantial in nature,* exists to support a verdict of guilty beyond a reasonable doubt." *State v. Motes*, 118 N.M. 727, 729, 885 P.2d 648, 650 (1994) (emphasis added) (internal quotation marks and citation omitted). "Intent is subjective and is almost always inferred from other facts in the case." *Id.* (internal quotation marks and citation omitted). In *Duran*, this Court held that the defendant's deliberate intent to kill could be reasonably inferred from the physical evidence of a struggle and multiple stab wounds suffered by the victim. 2006-NMSC-035*, ¶ 8.

{12}    In the present case, Victim was shot four times, including twice in the head. As in *Duran*, the jury could infer deliberate intent to kill from the physical evidence surrounding the killing alone. Multiple gunshot wounds, any one of which could have caused death, provide a reasonable inference that "the slayer . . . weigh[ed]  and consider[ed] the question of killing and his reasons for and against such a choice." UJI 14-201 NMRA. In addition to the physical circumstances of the killing, however, the evidence establishing that Defendant committed first degree murder is overwhelming. After leaving with Victim, Defendant returned to Lujan's house, washed blood off of his hands, and admitted to killing Victim.

7

Additionally, the evidence established that Defendant had a motive for killing Victim, namely, a dispute over a $50.00 debt, and that Defendant was seen carrying a weapon, which the jury reasonably could have found was used to kill Victim. Accordingly, we reject Defendant's sufficiency of the evidence claim.

**B.      Whether the district court abused its discretion by admitting a photograph displaying Victim's gunshot wounds to the head.**

{13}      Defendant asserts that the district court improperly admitted a graphic photograph of Victim taken at the crime scene because the photo's probative value was substantially outweighed by the danger of unfair prejudice. The photograph in question is a close-up of Victim's head from the neck up. It shows the gunshot wound to Victim's right eye and the resulting gore from that wound. Also visible is a second gunshot wound to the upper-left side of Victim's head and a large pool of blood surrounding Victim's head.

{14}      In reviewing a trial court's admission of photographic evidence, we utilize an abuse of discretion standard. *State v. Saiz*, 2008-NMSC-048, ¶ 53, 144 N.M. 663, 191 P.3d 521, *abrogated by State v. Belanger*, 2009-NMSC-025, __ N.M. __, __ P.3d __, *cert. granted*, 2007-NMCERT-010, __ N.M. __, __ P.3d __ (No. 30,654, May 12, 2009). We have established that "[a]n abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case." *State v. Woodward,* 121 N.M. 1, 4, 908 P.2d 231, 234 (1995). Further, "[a] trial court has great discretion in balancing the prejudicial

8

impact of a photograph against its probative value." *State v. Mora*, 1997-NMSC-060, ¶ 55, 124 N.M. 346, 950 P.2d 789.

{15} "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." Rule 11-403 NMRA. "The trial court ought to exclude photographs which are calculated to arouse the prejudices and passions of the jury and which are not reasonably relevant to the issues of the case." *State v. Boeglin*, 105 N.M. 247, 253, 731 P.2d 943, 949 (1987).

{16} However, graphic photographs are not per se unduly prejudicial, and district courts are afforded broad discretion concerning admission of relevant photographic evidence. "Photographs are relevant and admissible for the purpose of clarifying and illustrating testimony." *Mora*, 1997-NMSC-060, ¶ 54. For example, in *Boeglin*, this Court upheld the admission of a close-up photograph depicting gruesome neck wounds suffered by the victim, proffered to "illustrate, clarify, and corroborate the testimony of witnesses." 105 N.M. at 253, 731 P.2d at 949. Similarly, in *Saiz*, we held that the district court did not abuse its discretion by admitting five photographs of the victim's decomposed body, where those photographs aided the pathologist's testimony explaining the nature of the victim's injuries to the jury. 2008-NMSC-048, ¶ 54; *see also Mora*, 1997-NMSC-060, ¶ 55 (holding that admission of autopsy photographs was not an abuse of discretion).

9

Photographs showing a victim's injuries, therefore, are probative "to show the nature of the injury, to explain the basis of the forensic pathologist's opinion, and to illustrate the forensic pathologist's testimony," and may be admitted for such purposes. *State v. Garcia*, 2005-NMCA-042, ¶ 50, 137 N.M. 315, 110 P.3d 531.

{17} In the present case, the contested photograph was relevant to the State's case at trial and was not unduly prejudicial. For the reasons previously explained, the location and severity of the wounds depicted in the photograph supported the State's claim that the killing was committed with deliberate intent. Additionally, the pool of blood shown in the photograph corroborated Lt. Zuniga's testimony, that Victim was shot and killed where his body was found, thus buttressing the State's theory that Defendant had lured Victim away from witnesses to kill him. The district court acknowledged the potential prejudicial effect of the photograph on the jury and appropriately limited the admission of photographic evidence. *See Boeglin*, 105 N.M. at 253, 731 P.2d at 949 (holding that the district court properly "exercised its discretion carefully by compelling the State to choose one of the two proffered relevant photographs which served to illustrate, clarify, and corroborate the testimony of witnesses for the prosecution and the defense"). Given the relevance of the photograph and the district court's due consideration of the potential prejudice to the jury, we conclude that the court did not abuse its discretion by admitting the photograph.

**C.     Whether the district court abused its discretion by qualifying Lt. Zuniga as an expert witness in blood spatter analysis.**

**{18}**     Defendant's final contention on appeal is that the district court improperly qualified the State's witness, Lt. Zuniga, as an expert in blood spatter evidence, because he lacked sufficient knowledge, training and experience.  We review Defendant's claim for an abuse of discretion.  *State v. Alberico*, 116 N.M. 156, 169, 861 P.2d 192, 205 (1993).  Generally "any doubt regarding the admissibility of scientific evidence should be resolved in favor of admission, rather than exclusion."  *State v. Fry*, 2006-NMSC-001, ¶ 55, 138 N.M. 700, 126 P.3d 516 (internal quotation marks and citation omitted).

**{19}**     Rule 11-702 NMRA governs the admission of expert testimony:  "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."  Therefore, Rule 11-702 predicates the admissibility of expert testimony on three requirements, that (1) the expert be qualified; (2) the testimony be of assistance to the trier of fact; and (3) the expert's testimony be about scientific, technical, or other specialized knowledge with a reliable basis.  *Alberico*, 116 N.M. at 166, 861 P.2d at 202.  Defendant challenges the admission of Lt. Zuniga's testimony solely on the basis of the first requirement.

**{20}**     In general, the district court judge has wide discretion to determine whether

11

a witness is qualified to give expert testimony. In *State v. Downey*, we recently explained that

> [u]nder Rule 11-702, a witness must qualify as an expert in the field for which his or her testimony is offered before such testimony is admissible. In most cases, this means that the calling party must qualify the witness to testify as an expert first, before any substantive testimony is given. In order to testify, it must appear that an expert witness has acquired sufficient knowledge, skill, training, or experience that such testimony will aid the fact finder, but no set criteria can be laid down to test such qualifications. The use of the disjunctive "or" in Rule 11-702 permits a witness to be qualified under a wide variety of bases, "knowledge, skill, experience, training, or education," and underscores that broad discretion intentionally is given to the trial court to determine whether expert testimony will assist the trier of fact.

2008-NMSC-061, ¶ 26, 145 N.M. 232, 195 P.3d 1244 (internal quotation marks and citations omitted). Once the district court determines that an expert witness is qualified under any one of the wide variety of bases enumerated in Rule 11-702, any perceived deficiencies in the expert's qualifications pertain to the weight of the evidence, rather than its admissibility. *See State v. McDonald*, 1998-NMSC-034, ¶ 21, 126 N.M. 44, 966 P.2d 752 ("[T]he jury [is] free to weigh every aspect of the expert's qualifications and [is] free to disregard it entirely.").

{21} The State sought to introduce blood spatter evidence through the testimony of Lt. Zuniga in order to establish that blood spatter patterns and blood pooling at

12

the crime scene indicated that Victim was shot and killed where his body was found. Defense counsel objected to Lt. Zuniga's qualification as an expert in blood spatter analysis, and in response, the court permitted counsel to voir dire the witness. Voir dire revealed that Lt. Zuniga had received a composite 40 hours of blood spatter training over the course of three separate training sessions from 2001 through 2004. Lt. Zuniga explained that the first and last training sessions were conducted by the Department of Public Safety and taught by officer Art Ortiz, the head of the crime scene processing unit for the New Mexico State Police. The second training session was conducted by an independent company and taught by pathologist Sandra Maes. At the conclusion of voir dire, the court found Lt. Zuniga to be an expert in blood spatter evidence.

{22}     Defendant provides no meaningful argument as to why the jury should not have been allowed to hear Lt. Zuniga's testimony and weigh his qualifications. Given Lt. Zuniga's specialized training in blood spatter recognition and his experience as an investigator, we cannot say that his qualifications were deficient to such a level that the district court committed an abuse of discretion by allowing him to testify.

**III.     CONCLUSION**

{23}     For the foregoing reasons, we affirm Defendant's conviction of murder in the first degree.

**{24}** **IT IS SO ORDERED.**

_____

**PETRA JIMENEZ MAES, Justice**

14

**WE CONCUR:**

_____
**EDWARD L. CHÁVEZ, Chief Justice**


_____
**PATRICIO M. SERNA, Justice**


_____
**RICHARD C. BOSSON, Justice**


_____
**CHARLES W. DANIELS, Justice**

15